IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

UNITED STATES OF AMERICA
and GREGORY CHABOT,

     Plaintiff,                         Case No. 6:06-CV-1528-MSS-KRS

v.

MLU SERVICES, INC.,

     Defendant.

_____/

## DEFENDANT MLU SERVICES, INC.'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY FROM PAUL J. DEL VECCHIO

COMES NOW the Defendant, MLU Services, Inc. ("MLU"), by and through the undersigned counsel files this Motion in Limine to exclude the expert opinion of Relator Gregory Chabot's ("Chabot") expert witness, Paul J. Del Vecchio ("Del Vecchio"). Mr. Del Vecchio's opinions do not meet the admissibility standards set forth in Federal Rule of Evidence 702 and should be excluded.

## BACKGROUND

Chabot has brought a one count complaint against MLU, alleging violation of the federal False Claims Act, with respect to MLU's installation of "manufactured homes[1]" under a contract with FEMA. Chabot claims that MLU's purported manufactured home installations in Florida required MLU to have either a Florida Mobile Home Installation License ("MHI license") under Fl. St. § 320.8249, or a Division I contracting license

---

[1] While Chabot alleges that MLU only installed "manufactured homes" the evidence attached as part of MLU's Motion for Summary Judgment (Dkt. 44) shows that MLU only installed travel trailers under its FEMA contract.

1

under Fl. St. § 489. (Dkt. 35). Chabot claims that MLU did not have either license and thus defrauded the Federal Government in bidding on and submitting invoices for "manufactured home" installations.

In an attempt to bolster Chabot's allegations that the installation activities performed by MLU required either an MHI license or Division I contractor's license, Chabot has retained an expert witness Paul J. Del Vecchio to provide certain opinions related to the licensing requirements under Chapter 489 and Chapter 320 of the Florida Statutes. Chabot produced an affidavit from Del Vecchio on April 6, 2009 which sets forth the substance of the opinions he intends to provide at trial. (A true and correct copy of Del Vecchio's affidavit is attached as Exhibit A).

As set forth in paragraph one of his affidavit, Del Vecchio was asked to provide an opinion on the following two questions:

> First, can someone who is unlicensed in Florida, who is not acting as an owner-builder, enter a contract, which requires the performance of construction activities regulated by Chapter 489?
>
> Second, where the contract includes the construction activities listed in Chapter 489 can an unlicensed person who is not an owner builder, subcontract with licensed contractors to perform the work?

(Affidavit, ¶ 1).

Del Vecchio is simply being asked to interpret a statute and apply it to the facts in the case and render a legal opinion on whether MLU can "legally" enter into a contract or subcontract and whether that violates Florida law. Del Vecchio's affidavit is nothing more than his personal opinion about whether MLU was required to have either a Chapter 320 MHI license or a Division I contractor's license to perform certain parts of the work

2

under its FEMA contract. Supplying the jury with a legal conclusion is inappropriate for an expert, as it is the exclusive province of the Court.

Additionally, in his affidavit, Del Vecchio goes on to state opinions for which he lacks the requisite foundation concerning MLU's eligibility under FAR regulations to enter into the contracts. Del Vecchio also makes improper and unsupported factual conclusions based on a partial review of the record evidence, further invading the province of the jury. Finally, Del Vecchio's affidavit and opinions therein were untimely and disclosed after the expert discovery deadline. Based on these reasons, MLU respectfully requests the Court to exclude any of the opinions by Del Vecchio as reflected in his affidavit.

## **MEMORANDUM OF LAW**

Federal Rule of Evidence 702 requires experts have specific "knowledge, skill, experience, training, or education" to render expert testimony, and that the testimony be based upon (1) sufficient facts, (2) reliable principles and methods, and (3) the application of the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. "The Federal Rules of Evidence assign to the trial judge the gatekeeper task of ensuring that an expert's testimony, whether scientific or non-scientific, rests on a reliable foundation and is relevant to the task at hand." *Powell v. Carey Int'l, Inc.*, 2007 WL 1068487, at *3 (S.D. Fla. 2007); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Expert

testimony should help elucidate matters that are beyond the understanding of the average lay person. *U.S. v. Henderson*, 409 F.3d 1293, 1304 (11th Cir. 2005).

Federal Rule of Evidence 704(a) allows an expert to testify in the form of an opinion or inference that embraces the ultimate issue to be decided by the trier of fact. However, expert testimony that expresses a legal conclusion is not proper expert testimony and is inadmissible. *Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1112, n.8 (11th Cir 2005)(finding that "an expert witness may not substitute for the court in charging the jury regarding the applicable law"); *McMahon Sec. Co., L.P. v. FB Foods, Inc.*, 2007 WL 473666, at *2 (M.D. Fla. 2007). Further, an expert witness may not testify as to the legal implications of conduct. *Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)(finding that an expert may not tell the jury what result to reach and "the ***court*** must be the only source of the law")(emphasis added); *see also Dahlgren v. Muldrow*, 2008 WL 186641, at *5 (N.D. Fla. 2008) (finding "all witnesses generally are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct"); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)(holding that expert witness was improperly allowed to offer legal conclusion that defendant violated statute).

In addition, an expert's opinions may be excluded if its prejudicial impact substantially outweighs its probative value to the jury. Fed. R. Evid. 403.

A.     **Del Vecchio's opinions are nothing more than inadmissible legal conclusions**

Del Vecchio's affidavit reads more like a motion for summary judgment than an expert report, as he does nothing more than read and apply the Florida Statutes to give an opinion on whether MLU complied with those statutes.  Del Vecchio ventures into the role of trial judge and repeatedly states what Chapter 320 and 489 require or prohibit and whether MLU violated those statutes.  In fact, this is what Del Vecchio was asked to do by Chabot according to the two "predicate" questions contained in paragraph 1 of his affidavit.  Del Vecchio admitted in his deposition, that he was simply rendering an impermissible legal conclusion:

Q.     On page one of your affidavit you identified two questions that you were asked to render an affidavit on?

A.     Yes, sir.  To answer both of those questions I looked at the Florida Contracting Statute    Chapter 489 and applied the provision of that statute to the facts of this case.  Yes, sir.

Q.     And interpreted what the requirements of 489 would be with respect to what MLU, the scope of work MLU contracted for?

A.     Correct.

(Del Vecchio Depo., 77:20- 78:4; a true and correct copy of the relevant portions of Del Vecchio's deposition is attached as Exhibit B).

He also admits that he is not providing the jury with any explanation or interpretation of any technical terms with any specialized meaning within the construction industry, but is simply reading the statute and rendering an opinion as to what licenses MLU needed for its scope of work.  (Del Vecchio Depo., 78:22- 79:1).  This is clearly an inadmissible expert opinion under well established Eleventh Circuit

case law, as the legal interpretation of a contract or the legal implications of a party's conduct under the contract are not proper opinions for experts. *See e.g. Montgomery*, 898 F.2d at 1531(finding trial court erred in admitting expert testimony that a party had a duty to retain tax counsel).

Indeed, Del Vecchio's opinions go even beyond the types of licenses he thinks are required, as he provides multiple improper legal conclusions throughout his affidavit. Most of Del Vecchio's affidavit is comprised of simply reciting and summarizing various portions of Chapter 320 and 489. (See affidavit, ¶ ¶ 5, 6, 7, 8). The many improper legal conclusions Del Vecchio makes in his affidavit include the following:

- MLU's "work in the contracts did not fall within one of the licensing exemptions of F.S. 489.103." (Affidavit, ¶ 3).

- "MLU's standard installation contract required at a minimum the services of a Division 1 contractor. . . to *legally* enter the contract. . . ." (Affidavit, ¶ 4).

- MLU could only "tender for acceptance those items that conformed to the contract" (Affidavit ¶ 4).

- "MLU was required at a minimum to be registered with the DBPR. . . in order to be *eligible* to enter into the contract with FEMA. . . ." (Affidavit ¶ 5).

- "When an unlicensed person holds himself or herself out as a licensed contractor. . . that person knowingly violates F.S. 489.127(1)(a)-(f) but also commits a *felony* under F.S. 489.127(2)(c)" (Affidavit ¶ 8).

- MLU engaged in contracting. . . and without a license in *violation of Florida law* since it negotiated and submitted a bid, entered into the FEMA contract and

6

subcontracted with others. . . ." (Affidavit, ¶ 9).

- "MLU's claim that it was authorized to enter into the contract. . . is *unfounded*" (Affidavit ¶ 11).

- "It is clear that MLU not only entered into the construction contract *illegally* in violation of Chapter 489, but also further *illegally acted* in the capacity of Division 1 Florida contractor by subcontracting." (Affidavit, ¶ 11).

- "A *minimally sufficient inquiry* for out of state contractors. . . would require them to fully disclose the contractual services and the necessary subcontracting to both the mobile home licensing bureau and Florida's DBPR. . . ." (Affidavit, ¶ 12).

- MLU's testimony that it is unaware of state licensing requirements only underscores its continued *deliberate ignorance* conduct (sic)." (Affidavit, ¶ 13).

- "It is my understanding. . . that every contract in question is *void and unenforceable* based on F.S. 489.128." (Affidavit, ¶ 16).

As the Court can clearly see, Del Vecchio's affidavit is replete with inadmissible opinions, including that the contracts are "illegal," "void and unenforceable," MLU's conduct is criminal, MLU was not "eligible" to submit a bid, MLU did conduct a "minimally sufficient inquiry," was "deliberately ignorant" and "violated Florida law." All of Del Vecchio's opinions in the affidavit involve simply reading a statute and applying it to the facts at issue and telling the jury the legal implications of MLU's actions. Del Vecchio does nothing to assist the jury to decide any issue of fact, namely, whether MLU intentionally submitted false claims to the Federal Government.

It is the Court's job to interpret the law and determine what the Florida Statutes require and instruct the jury accordingly. This is not a case in which the Court needs expert testimony to assist it in determining what the Florida Statutes require with respect to licensing. The Court is more than capable of reading the relevant statutory provisions and making a determination about the licensing schemes in Florida, as it has done in the previous Chabot cases with respect to whether travel trailer installations required licensing. Del Vecchio's entire affidavit invades this Court function. As stated above, an expert cannot testify as to the legal implications of conduct or invade the Court's role in instructing the jury on the applicable law.

Chabot may argue that Del Vecchio's opinions involve the interpretation of the FEMA contract to assist the jury. However, this is also not a proper subject matter for expert testimony. Interpretation of a written contract is a matter of law to be determined by the court. *McMahan Sec. Co. v. FB Foods, Inc.*, 2007 WL 47366, *2-3 (M.D. Fla. Feb. 8, 2007); *Orlando Regional Healthcare Sys. Inc. v. Columbia/HCA Healthcare, Corp.*, 923 F. Supp. 1534, 1544 (M.D. Fla. 1996).

All of Del Vecchio's opinions in his affidavit are wholly irrelevant, do not assist the jury and should be excluded under Rule 702.

**B.     Del Vecchio also makes improper and unsupported factual conclusions and findings which are irrelevant and inadmissible**

In addition to making numerous inadmissible legal conclusions, Del Vecchio also provides several factual findings which invade the province of the jury and for which he lacks to requisite foundation under Rule 702.

For example, Del Vecchio opines that MLU's claim that it was authorized to enter into the contract with FEMA is "unfounded." (Affidavit, ¶ 11). He also states that the "record" demonstrated that MLU did not disclose to FEMA that it did not have a Division I contractor's license or disclose to state regulators its contract. *Id.* Such conclusory factual statements are impermissible for experts as they do nothing to assist the jury with any technical or specialized information or assist them in reaching their own conclusions about the evidence. These conclusory statements in fact usurp the function of the jury, and should be excluded. *Cook*, 402 F.3d at 1107 (in determining admissibility of expert opinion, trial court must consider whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue).

Del Vecchio also makes statements and representations about topics without the appropriate foundation required in Rule 702. Specifically, in paragraph ten of the affidavit, Del Vecchio states that MLU was "required" to only tender those items which conformed to the contract and obtain a "de obligation" report from FEMA to delete those items to which it was ineligible to contract. *Id.* at ¶ 10. Del Vecchio admits that this statement is only based upon his experience with "working under the FAR, Federal Acquisition Regulations. (Del Vecchio Depo. 89:24-90:1). Del Vecchio is not proffered, however, as an expert with the FAR and his affidavit shows he was asked only to provide opinions on the licensing issues related to MLU's work. Moreover, Del Vecchio's opinion related to a de-obligation report is flatly contradicted by the FEMA witness Bryan McCreary who testified that MLU could have properly bid only on travel trailers

from the beginning and thus receive a contract only for travel trailers. (McCreary Depo., 41:8-12, relevant portions of McCreary's deposition are attached as Exhibit C).

Del Vecchio also comments on the "routine" defense of ignorance raised by unlicensed persons in defense to criminal prosecutions as being "routinely rejected by the State of Florida" and "routinely insufficient to prevent a criminal prosecution." *Id.* at ¶ 12. Clearly, Del Vecchio does not have the sufficient foundation to provide this unscientific and vague opinion of the results of hundreds of prosecutions statewide and draw conclusions about the defenses raised in each one. Moreover, this conclusory statement does nothing to assist the jury in its role of evaluating whether MLU made a false claim to the Government.

**C.    The danger of unfair prejudice far outweighs the probative value of Del Vecchio's opinions**

In addition to being wholly improper legal and factual conclusions which do not assist the jury, his opinions are unduly prejudicial and should be excluded under Rule 403. For example, Del Vecchio makes the following statements which are highly prejudicial in front of a jury.

- that MLU committed a "felony," and was "deliberately ignorant" and "illegally acted" (Affidavit, ¶ 8, 11, 13).

- that the DBPR Construction Industry Licensing Board "prosecutes and fines hundreds of unlicensed persons" and refers cases to the state for "criminal prosecutions and criminal prosecutions." (Affidavit ¶ 8).

- the routine defense raised by unlicensed persons prosecuted for entering into construction contracts is that they were unaware of the law and this defense is "routinely rejected by the State of Florida and is routinely insufficient to prevent a criminal prosecution." (Affidavit ¶ 12).

These inflammatory and irrelevant commentaries on MLU's conduct are unfairly prejudicial and should be excluded under Rule 403. This is not a case about whether MLU committed a crime or acted "illegally," but rather whether MLU knowingly and intentionally defrauded the Government by installing travel trailers under its FEMA contract. Del Vecchio's opinions with respect to "hundreds" of prosecutions he has allegedly "experienced" are of no probative value to the jury's role, are unduly prejudicial and should be excluded under Rule 403.

**D.** **Del Vecchio's affidavit was disclosed untimely as it is not a rebuttal affidavit**

In the Court's Case Management and Scheduling Order, the deadline for the plaintiff to disclose expert witnesses was March 2, 2009, for the defendant, April 1, 2009 and rebuttal experts May1, 2009. (Dkt. 27). Chabot's counsel served the Del Vecchio affidavit on MLU on April 6, 2009. Chabot captioned Del Vecchio's affidavit as a "rebuttal affidavit" and represented that it was a rebuttal to William Ulm's deposition testimony taken on March 5, 2009. Chabot stated that he believed Ulm, who has a general contractor's license, was a "hybrid fact/expert" witness who gave his opinion about the necessity of having a building contractor's license to install travel trailers. Accordingly, Chabot retained Del Vecchio to provide a "rebuttal" opinion. Notably, Del Vecchio testified that he did not know who he could have been rebutting in his affidavit

11

and did not consider his affidavit as a "rebuttal affidavit." (Del Vecchio Depo., 35:22 – 36:2).

Del Vecchio is correct that his affidavit is not a "rebuttal affidavit" as it is undisputed that MLU did not disclose or identify any expert witness prior to its deadline of April 1, 2009. Mr. Ulm's testimony about his belief of whether MLU's travel trailer installations required a building contractor's license is not traditional "expert" testimony, but rather a statement of his intentions and state of mind at the time, which is an issue in the case. Ulm is a fact witness who is testifying about his beliefs at the time concerning what licenses he thought the work required. Intent is an element of Chabot's claim and Ulm's testimony on his intent does not somehow convert his testimony into an expert opinion.

As Chabot disclosed Del Vecchio's affidavit more than one month after the expert deadline and thus violated Rule 26, Del Vecchio's opinions contained in the affidavit should be excluded under Fed. R. Civ. P. 37(c)(1).

## CONCLUSION

For the foregoing reasons, MLU respectfully requests the Court preclude Chabot from offering any testimony from his expert, Paul J. Del Vecchio.

12

## 3.01(g) CERTIFICATION

The undersigned has conferred with Relator's counsel, Kevin Darken, who has indicated that he opposes the relief requested herein.

Submitted this 13th day of April, 2010.

/s/ Mark D. Kiser
JOHN S. VENTO
jsvento@trenam.com
Florida Bar No. 329381
MARK D. KISER
mkiser@trenam.com
Florida Bar No. 0420409
TRENAM, KEMKER
101 East Kennedy Boulevard, Ste 2700
Tampa, Florida 33602
(813) 223-7474 / (813) 229-6553 facsimile
Attorneys for Defendant, MLU Services, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of April, 2010, the foregoing was filed with the Clerk of this Court by CM/ECF, which will send an electronic notice of filing to the following:

Jennifer Chorpening
U.S. Department of Justice – Civil Division
PO Box 261
Washington, DC 20444

Phillip R. Lammens, Esq.
Office of US Attorney
207 NW 2nd Street, Room 118
Ocala, FL 34475-6666

Paul M. Meredith
The Meredith Law Firm
5 Palm Row –Ste A, P.O. Box 38
St. Augustine, FL 32085-0038

By:    /s/ Mark D. Kiser
Attorney

13

-4384044v1

**EXHIBIT "A"**

Case 6:06-cv-01528-MSS-KRS    Document 92    Filed 04/13/10    Page 15 of 42 PageID 1443

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,
ex rel. GREGORY CHABOT, as *qui
tam* Plaintiff,

      Plaintiffs,

vs.

                            CASE NO:
                            6:06-cv-01528-PCF-JGG

MLU SERVICES, INC., a Georgia Corporation,

      Defendant.

_____/

**STATE OF FLORIDA**

**COUNTY OF PALM BEACH**

<u>**AFFIDAVIT OF PAUL J. DEL VECCHIO**</u>

I, Paul J. Del Vecchio, do hereby swear to the following:

1.     I've been asked to render an affidavit assessing the following questions related to the licensing requirements under Chapter 489 Florida Statutes and Chapter 320 Florida Statutes. First, can someone who is unlicensed in Florida, who is not acting as an owner-builder, enter a contract, which requires the performance of construction activities regulated by Chapter 489? Second, where the contract includes the construction activities listed in Chapter 489 can an unlicensed person who is not an owner builder, subcontract with licensed contractors to perform the work? The answer is a simple no, unless the work falls into one of the exemptions to contracting without a license such as the owner-builder exception under 489 or the person has directly employed as a 941 employee a qualified agent and has registered with the DPBR or the

1

Case 6:06-cv-01528-MSS-KRS    Document 92    Filed 04/13/10    Page 16 of 42 PageID 1444

qualifying agent is a percentage owner in the business or the person is licensed under F.S. 320.8249(1) which permits the subcontracting activities requiring a license under Chapter 489; as does the only other specifically enumerated exception based on Florida Statute Chapter 320, Florida Administrative Code 15c-2-2.0072 (1), which allows Florida Licensed Dealers and Manufacturers to sell packages that includes a limited allowance of subcontracting.

2.    For the owner-builder exemption to apply the contractor must be the owner and the construction must involve residential property in which the owner will occupy and use.  F.S. 489.103(7).

3.    Having reviewed the contracts entered into by MLU as well as the testimony of MLU's corporate representative on those questions I have been asked to render an opinion, it is certain the work in the contracts did not fall within one of the licensing exemptions of F.S.489.103. According to the testimony of corporate representative Ulm neither he nor MLU was an owner builder since FEMA owned the travel trailers he installed.  (Ulm depo at P. 80 lines 10-23. )

4.    MLU's standard installation contract required at a minimum the services of a Florida licensed Division I contractor (Certified General Contractor, Certified Building Contractor or Certified Residential Contractor) to legally enter the contract since the general terms of the contract required MLU to comply with all Federal, State and Local Regulations. See e.g. (MLU 1256 ¶. Specifically, under the contract's installation standards, all work performed was to be in compliance with all Federal, State and Local codes and regulations. MLU 1270) ¶ 1) Additionally, the contract also states that its provisions shall not be construed as lowering the standards of Local laws, regulations or codes. *Id.*  MLU could only tender for acceptance those items that conformed to the contract. See  (MLU 1245 ¶ (a)). In order to enter

2

into the contract and subcontract with licensed contractors to install travel trailers, MLU would

have had to have a Division I contractor's license since the contract required that MLU engage

in construction activities governed by Chapter 489. These construction activities set forth in the

contract include but are not limited to sanitary sewer, electrical, domestic water line connection,

but included the construction of sanitary sewer systems, electrical supply, water distribution

systems and construction of means of egress structures such as handicap ramps. See (MLU

1253 TT 02-09, and TT-14, 16, 19), MLU 1270-1282 Travel Trailer Installation Specifications)

    5.    As such, MLU was required at a minimum to be registered with the DPBR and

directly employ a qualifying agent who held a Division I contracting license in order to be

eligible to enter into the contract with FEMA and directly perform the construction activities

under the contract and subcontract with electrical and plumbing contractors. F.S. 489.113(1)(2)

F.S. 489.105(4)(5) Alternatively, the qualifying agent for MLU could have been a percentage

owner in the business who held a Division I license. *Id.* Some local governments such as Lee

County require that the person or business entering into a contract to install travel trailers hold a

mobile home installers license under Chapter 320 Florida Statutes because of the similarity of

the installation. However, even in Lee County, a Mobile Home Installation License (MHI)

would be inadequate for site built handicap ramps and staircases. An MHI License can only

install factory built ramps. It appears that MLU went further than a Licensed MHI would be

authorized by constructing site built additions.

    6.    Florida Statutes 489.105(6) defines "contracting" as engaging in business as a

contractor to include the acts of a contactor defined in (3) such as for example, electrical,

plumbing, water line construction and the construction of structures that were performed under

MLU's contract. Florida Statutes 489.105(6) further define "contracting" as the attempted sale

of contracting services and the negotiation or bid for a contract on these services. If the services offered require licensure and/or agent qualification, the offering, negotiation for a bid, or attempted sale of these services requires the corresponding licensure. *Id.*

7.    The prohibitions contained in the contracting statute F.S. 489.127(1)(a-f) are virtually identical to the prohibitions in the mobile home installers statute. F.S. 320.8249(7)(a-f). Both statutory schemes expressly prohibit a person from falsely holding himself or herself or a business organization out as a licensee, falsely impersonating license, presenting as his or her own license a license held by another, giving false or forged evidence to regulators, using a license that has been suspended or revoked, or engaging in the business or acting in the capacity of a contractor or advertising himself or herself or a business organization as available to engage in the business or act in the capacity of a contractor without being duly licensed.

8.    Based on the prohibitions of F.S. 489.127(1), the DPBR prosecutes and fines hundreds of unlicensed persons, who enter into contracts with consumers and subcontract with licensed contractors. Moreover, DPBR has referred many of these cases to the state of Florida for criminal prosecution resulting in convictions. When an unlicensed person holds himself or herself out as a licensed contractor available to engage in a licensed activity by entering into construction contracts in a declared emergency, that person not only violates F.S. 489.127(1)(a-f) but also commits a felony under F.S. 489.127(2)(c). The same conduct involving unlicensed contracting for the installation of mobile homes and park trailers would also constitute a misdemeanor under F.S. 320.8249(1) since it violates the identical provisions contained in F.S. 320.8249(7).

9.    The record reveals that MLU did not have a Division I qualifying agent, either on the payroll or as a percentage owner of the business. As such, MLU engaged in contracting as

4

defined by F.S. 489.105(6) and without a license in violation of Florida law since it negotiated and submitted a bid, entered into the FEMA contract and subcontracted with others involving construction activities that required a license. MLU also engaged in unlicensed contracting when it constructed a handicap ramp and other structures.

10.    Because MLU was required under the contract to only tender those items which conformed to the contract, MLU was required to only bid a portion of the contract that did not require a license and obtain from the government a de-obligation report to delete those items to which it was ineligible to contract. The record reveals that MLU failed to obtain the de-obligation report.

11.    MLU's claim that it was authorized to enter into the contract with FEMA and physically perform construction activities and subcontract with licensed contractors is unfounded. MLU admits that it did not investigate the state licensing requirements for a Division I general contractor under F.S. 489 nor consider its ineligibility to enter into a contract with FEMA and subcontract with licensed contractors. (Ulm depo at P. 75 L. 16 thru P. 79 L. 21) Instead, MLU inquired to the Bureau of Mobile Homes as to whether it needed a mobile home installer's license, (Ulm depo at P. 77 L.18-21) and to FEMA as to whether it needed a MHI license for a basic travel trailer set up. (See e.g. Ulm depo at P. 76 L. 12-20) MLU did not request a determination from the state or federal government as to any other licensing requirements and specifically never inquired as to the licensing requirements as to the regulated construction activities to be performed under the contract that were in addition to the basic travel trailer set up which did not require a license. *Id* (Ulm depo at P. 75 L. 16 thru P. 79 L. 21) While neither a Division I contractors license nor a mobile home installers license is required for the temporary installation of travel trailers, whose intended use is an overnight stay with an

5

electrical plug in and water hose connection, a license is required under F.S. 489 when the intended use of travel trailers is permanent or semi-permanent, which requires the trailer to be strapped to the ground, handicap ramps constructed, electrical poles erected and plumbing subcontracted since these are regulated construction activities. The records demonstrates MLU did not disclose to FEMA that it did not have a Division I Florida contractor's license or disclose to state regulators its contract, which contained the construction activities that required a license under Chapter 489. (Ulm depo at P. 82 L. 20-21)  Instead, it is clear that MLU not only entered into the construction contract illegally in violation of Chapter 489, but also further illegally acted in the capacity of Division I Florida contractor by subcontracting.

12.  A minimally sufficient inquiry for out-of-state contractors, who are contemplating entering into the contracts for mobile homes, park trailer and travel trailer installations, would require them to fully disclose the contractual services and the necessary subcontracting to both the mobile home licensing bureau and Florida DBPR's Construction Industry Licensing Board. The Licensing Board had full-time employees who were available to answer questions of this nature and there is no evidence that anyone in the Florida Construction Industry Licensing Board was consulted at all.   Based on my experience as a member of Florida DBPR's Construction Industry Licensing board, the routine defense raised by unlicensed persons prosecuted for entering into construction contracts is that they were unaware of the law because they have failed to conduct a reasonable investigation. The ignorance defense is routinely rejected by the State of Florida and is routinely insufficient to prevent a criminal prosecution.

13.  MLU's testimony that to this day it is still unaware of state licensing requirements of Chapter 489 only underscores its continued deliberate ignorance conduct. Ulm admits that he has subsequently obtained a Division I general contractor's license under F.S. 489. (Ulm depo

P. 79 L. 22-25.) Yet Ulm still refuses to acknowledge that contracting without a license is a felony. (Ulm depo P. 80. L. 1-20) In order to obtain this license, Ulm had taken the training course, which clearly apprised him of the prohibitions against unlicensed contracting under F.S. 489. 127(1)(a-f) and pass an exam involving these regulations. Prior to obtaining this license, Ulm was required to attest that he had not engaged in unlicensed contracting as defined by those statutory prohibitions by entering to into construction contracts without a license.

14.    In conclusion, if the installation fell within the purview of F.S.320.8249 for a mobile home or park trailer, only a licensed Florida Mobile Home Installer (FMHI) could enter into the contract.   If the work fell outside the FMHI licenses, then a Division I contractor's license would then be required.   Chapter 320 Florida Statutes makes an exception to the licensing requirements reserved to contractors under Chapter 489 Florida Statutes. Chapter 320 and the Florida Administrative Code specifically permits Florida licensed mobile home installers to subcontract other licensed contractors performing construction activities who are licensed under Chapter 489 for the purpose of setting up mobile homes. The Florida Administrative Code makes specific an exception for Florida Licensed Manufacturer's and Dealers to subcontract installers and other licensed subcontractors so that they can sell package deals. A person who does not possess a Florida mobile home installer's license and who is not a Division I licensed contractor under Chapter 489 cannot enter into contracts for construction activities, which require a license under Chapter 489 and may not subcontract with other licensed contractors unless they fall into the specifically enumerated Florida Licensed Dealer or Manufacturer exception.

15.    I have reviewed the standard FEMA contracts for the installation or maintenance and deactivation of mobile homes, park trailers and travel trailers that were entered into by the

7

various FEMA "prime contractors," RCG, D&G Discount Homes Inc., Wilson-Multi Task Inc., Nu-Way, Westgate, RV Services Inc., and Peredes and Jones. These contracts also required the defendants to hold a qualified Florida mobile home license or a Division I Florida contractor's license since contracts involve construction activities that required a license.

16.     I have reviewed public records and none of these FEMA "prime contractors" where registered as required under F.S.489.113 (1)(2) F.S. 489.105(4)(5) and all were ineligible to hold themselves out as and enter into contracts with FEMA as general contractors or mobile home installer contractors in Florida at the time they entered into the contracts. It is my understanding as a member of the Florida Construction Industry Licensing Board that every contract in question is void and unenforceable based on F.S. 489.128.

### VERIFICATION

I, Paul J. Del Vecchio, hereby swear and affirm that I have read the foregoing Affidavit, and that the facts and allegations contained therein are true and complete to the best of my own personal knowledge and experience.

PAUL J. DEL VECCHIO

### ACKNOWLEDGMENT

Sworn to and subscribed before me this _06_ day of _APRIL_, 2009, by Paul J. Del Vecchio, who is ____ personally know to me or _✓_ who has produced _FL·DL D412690 45 350·0_ as identification, and who did take an oath.


HENRY RENAUD
MY COMMISSION # DD 561342
EXPIRES: June 7, 2010
Bonded Thru Notary Public Underwriters

Notary Public
My Commission Expires: _JoNe 7-2010_

8



# Paul J. Del Vecchio
## Curriculum Vitae

Paul J. Del Vecchio is a seasoned construction and real estate development professional with over 35 years of experience in Florida project development and construction services.

Early in his career, Mr. Del Vecchio worked as an owner's representative for a regional engineering firm that provided management services to county school boards, ports, power companies and a variety of developers including regional retail, multi-family and condominium developers.   Duties included attaining local government approvals, conceptual costs, construction document development and coordination, construction compliance with respect to codes, contract documents, and contract administration.

Later, Mr. Del Vecchio joined a then regional and now national construction firm as a project manager and then became a projects manager.  This position of management grew from a single project to multiple projects, which consisted of the construction operations of multiple condominiums from 14 stories to 32 stories, parking garages, shopping malls, hospitals, and government facilities.

From there, Mr. Del Vecchio served as vice president of construction for a local development firm.   This entailed the management of daily operations for the development and construction of some 740 residential units in a variety of configurations from single-family homes and garden apartments to a 15-story condominium over several developments throughout south and central Florida. This included the construction and operation of the infrastructures to support these developments.

Mr. Del Vecchio also served as vice president of operations and president for a local general contracting firm whose focus was the construction of federal projects.  Duties included all aspects of its existence including staff development, financial management, field operations and estimating.  Projects included general contracting services for the U. S. Army Corp. of Engineers, the U. S. Department of the Navy, the U. S. Department of Commerce, NASA, the U. S. Department of the Air Force, the U. S. Postal Service, and the Smithsonian Institute.  The firm received outstanding reviews and awards for its performance as a contractor for the U. S. Department of Defense.

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



**Paul J. Del Vecchio**
**Curriculum Vitae**
**Page 2**

During Paul J. Del Vecchio's career, he has provided consulting, arbitration and mediation participation as well as expert witness testimony to an array of clients to include owners, sureties, law firms and their clients and state agencies. Subject matter has included:

- Defective Work
- Contract Compliance
- Construction Costs
- Scheduling Analysis & Reconstruction
- Claims Analysis
- Claims Preparation
- Licensure

## Licenses & Certifications

- State of Florida Certified General Contractor Since 1979
- CCI – Certified Construction Inspector
- CCPM – Certified Construction Project Manager
- CCC – Certified Construction Consultant
- CEC – Certified Environmental Consultant

## Publications

- Co-author of "The Florida Contractors Manual, Millennium Edition" and "The Florida Contractors Manual, 2009 Edition" used as required reference material for the State of Florida Contractor's Exam. Area of authorship is the chapter entitled "Project Management".

## Professional Experiences

- Construction Industry Licensing Board for the State of Florida
  Tallahassee, FL.
  Board Member & Past Board Chair

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



**Paul J. Del Vecchio
Curriculum Vitae
Page 3**

### Professional Experiences – Con't

- Professional Testing Incorporated
  Tallahassee, FL
  Subject Matter Expert
- Broward County Bar Association Construction Law Committee
  Fort Lauderdale, FL
  Associate Member
- Construction Specifications Institute
  Professional Member
- Contractors Disaster Network for the State of Florida
  Tallahassee, FL
  Member
- Associated Builders & Contractors National
  Washington, D. C.
  Board Member
- Associated Builders & Contractors State
  Tallahassee, FL
  Board Member & Chairman
- Associated Builders & Contractors
  (East Coast Chapter) Boca Raton, FL
  Board Member & Chairman
- Construction Industry Management Council
  West Palm Beach, FL
  Council Member
- Construction Association of South Florida
  Fort Lauderdale, FL
  Board Member

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



# Paul J. Del Vecchio
# Court Cases

OVERHOLT CONSTRUCTION CORP., Plaintiff v.
JASCO CONSTRUCTION CO.; et al, Defendants
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR DADE COUNTY, FLORIDA
CASE NO. 07-36554 CA 20
Work performed for Plaintiff/Litigation Support and Claim Valuation

SAFEWHEY SERVICES, INC., Plaintiff/Counter-Defendant v.
OCEANVIEW PARK CONDOMINIUM ASSOCIATION, INC., Defendant/Counter-
Plaintiff
CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
CASE NO. 06-12103(25)
Work performed for Defendant/Litigation Support and Licensure Issues

CHARLES W. FOGLIO and MARSHA A. FOGLIO, PLAINTIFFS vs.
OCEAN BEACH DEVELOPMENT, LLC, a Florida Limited Liability Company, Defendant
CIRCUIT COURT OF THE EIGTHEENTH JUDICIAL CIRCUIT
IN AND FOR BREVARD COUNTY, FLORIDA
CASE NO. 05-2007-CA-007220-XXXX-XX
Work performed for Plaintiffs/Litigation Support and Contract Defects

MANUEL AIRALA and MARTA AIRALA, Plaintiffs vs.
OVERHOLT RESIDENTIAL CONSTRUCTION, INC., Defendant
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA, GENERAL JURISDICTION DIVISION
CASE NO. 08-27060 CA 30
Work performed for Plaintiff/Claim Development

RAFAEL CAPELLA, Plaintiff  v.
WALFRIDO GARCIA MIRANDA and RAMON LORENTE, Defendants
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA, GENERAL JURISDICTION DIVISION
CASE NO. 08-44690 CA 15
Work performed for Plaintiff/Licensure Issue and Damages Evaluation

-1-

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



# Paul J. Del Vecchio
# Court Cases

CONTINUUM ON SOUTH BEACH, THE SOUTH TOWER CONDOMINIUM
ASSOCIATION, INC., a Florida not for profit corporation, Plaintiff vs.
SOUTH BEACH OCEAN PARCEL, LTD., a Florida limited partnership, and SOUTH
BEACH OCEAN PARCEL, LTD., TURNER CONSTRUCTION COMPANY, a Florida
corporation, and IAN BRUCE EICHNER, individually, Defendants
TURNER CONSTRUCTION COMPANY, Cross-Defendant/Third Party Plaintiff vs.
RC ALUMINUM INDUSTRIES, INC., E & F CONTRACTORS, INC., FULLERTON DIAZ
ARCHITECTS, INC., and ASR INTERIORS, LLC, Third Party Defendants
IN AND FOR MIAMI-DADE COUNTY, FLORIDA, COMPLEX BUSINESS LITIGATION
DIVISION, CASE NO. 04-9462 CA 40
Work performed for Third Party Defendant/Litigation Support and Scope of Work Issues

MID-CONTINENT CASUALTY COMPANY, Plaintiff v.
AMERICAN PRIDE BUILDING COMPANY, LLC, a Florida limited liability company,
AMERICAN PRIDE BUILDER LLC, a Florida limited liability company, and
GROFF CONSTRUCTION, INC., a Florida corporation
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION
CASE NO. 2:07-cv-258-FtM-99SPC
Work performed for Plaintiff/Furnished Opinion on Development Costs for Design
Documents

JMS DEVELOPMENT CONSTRUCTION, INC., Plaintiff v.
CONTINENTAL CASUALTY COMPANY; WESTCHESTER FIRE INSURANCE
COMPANY, Defendant
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA, GENERAL JURISDICTION DIVISION
CASE NO. 07-25202 CA 40
Work performed for Defendant/Licensure and Scope of Work Issues

F & G DEVELOPERS CORP., a Florida corporation, Plaintiff v.
SIKON CONSTRUCTION CORPORATION, a Florida corporation, and
CONTINENTAL CASUALTY COMPANY, a foreign corporation, Defendants
CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

-2-

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



# Paul J. Del Vecchio
## Court Cases

CASE NO. 08-30912CA31
Work performed for Defendant/ Licensure and Scope of Work Issues

VANTAGE VIEW, INC., Plaintiff v.
QBE INSURANCE CORPORATION, Defendant
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 07-61038-CIV-MARRA
Work performed for Plaintiff/Storm Damage Assessment and Valuation (Prepared Estimated Cost of Damages)
ARTÉCITY PARK LLC & ARTÉPARK SOUTH DEVELOPMENT LLC, Plaintiffs v.
SOARES DA COSTA CS, LLC, Defendant
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA, CIVIL DIVISION
CASE NO. 08-17586CA31
Work performed for Plaintiff/Project Abandonment and Scope of Work Issue and Damages

J.A.M. SHELL BUILDERS, INC., Plaintiff, v. QUALITY CONCRETE GENERAL
CONTRACTOR, INC., Defendant
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY FLORIDA
CASE NO. 06-15484
Work performed for Plaintiff/Scope of Work and Contract Compliance Issue

NW SIGN INDUSTRIES, INC., f/k/a NW SIGN INDUSTRIES OF FLORIDA, INC.,
Plaintiff, v. LIBERTY MUTUAL INSURANCE COMPANY and SUITT CONSTRUCTION
CO., INC., Defendants
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 07-60340-CIV COOKE/BROWN
Work performed for Plaintiff/Scope of Work and Change Order Dispute

-3-

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



# Paul J. Del Vecchio
# Court Cases

EDGEWATER BY THE BAY, LLLP, a Florida Limited Liability Limited; Partnership, and SUNCOAST CONTRACTING CORP., a Florida corporation, Plaintiff, v. PLB CONSTRUCTION, INC., a Florida corporation, and PABLO LUIS BLANCO, a natural person, Defendants
CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, STATE OF FLORIDA
CASE NO. 07-23851 CA 30
Work performed for Defendants/Licensure and Scope of Work Issues

LAKE CLARKE GARDENS CONDOMINIUM, INC., a Florida not-for-profit corporation, Plaintiff, v. TRADE-WINDS ENVIRONMENTAL RESTORATION, INC., a foreign for-profit corporation, Defendant
IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2006CA 000803 XXXX ME
Work performed for Plaintiff/Licensure and Scope of Work Issues

HOME TECHNICAL SERVICES, INC. d/b/a BEACH BUILDING, Plaintiff, v. MICHAEL B. SMALL and ANN G. SMALL, Defendants
IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2005CA 009758 XXXX MB
Work performed for Defendants/Defective Work and Cost to Complete

-4-

Paul J. Del Vecchio Construction Consultants, Inc.
21218 St. Andrews Boulevard, Suite 204, Boca Raton, FL 33433
Phone 561.477.9911 • Fax 561.482.8971 • E-Mail info@pjdconsulting.net
www.pjdconsulting.net



**FEE SCHEDULE**

| | |
|---|---|
| Project Consulting (4-Hour Minimum) | $200.00/Hr |
| Contract Administration | $ 75.00/Hr |
| Claims & Litigation Support (4-Hour Minimum) | $200.00/Hr |
| Arbitration/Mediation/Deposition (4-Hour Minimum) | $300.00/Hr |
| Expert Witness (8-Hour Minimum) | $300.00/Hr |
| Inspection Fees (4-Hour Minimum) | $200.00/Hr |

Reimbursable expenses are billed separately from the charges for the Consultant's basic services. They are actual expenditures made by the consultant and his employees in the interest of the client. They include:

- Transportation and Living Expenses incurred in Work-Connected Travel
- Automobile Mileage @ $1.00/mile
- Airfare and Related Expenses
- Long Distance Telephone Calls, Facsimile
- Reproductions, Graphics, Computer-Assisted Drafting
- Postage, Courier Services, Printing

These expenses are invoiced at direct cost plus a 20% surcharge.

Travel time is not billable up to one hour. Additional travel time will be billed at 50% of consultant rate.

CLIENT: _____

-4-

21218 St. Andrews Blvd., Suite 204, Boca Raton, FL 33433-2449
Email: info@pjdconsulting.net · Website: www.pjdconsulting.net
Office: 561.477.9911 · Facsimile: 561.482.8971

**EXHIBIT "B"**

COMPRESSED TRANSCRIPT

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION


CASE NO. 6:06-CV-1528-MSS-KRS


UNITED STATES OF AMERICA

and GREGORY CHABOT,


       Plaintiff,


vs.


MLU SERVICES, INC.,

       Defendant.

_____/


DEPOSITION OF PAUL DEL VECCHIO


Monday, July 22, 2009


10:00 a.m. to 3:45 p.m.


2255 Glades Road

Boca Raton, Florida


Reported By:

DEBORAH LAWRENCE, Court Reporter

Notary Public, State of Florida

**2**

1  APPEARANCES:
2  On behalf of the Plaintiff
   PAUL M. MEREDITH, ESQUIRE
3  The Meredith Law Firm
   5 Palm Row  Suite A
4  P.O. Box 38
   St. Augustine, Florida 32085
5
6  On behalf of the Defendant
   MARK D. KISER, ESQUIRE
7  Trenam Kemker
   101 E. Kennedy Blvd.  Suite 2700
8  Tampa, Florida 33602
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1           INDEX
2
3  WITNESS:   DIRECT  CROSS  REDIRECT  RECROSS
4  PAUL DEL VECCHIO
5  BY MR. KISER    4
6
7
8         EXHIBITS
9
10 NUMBER                    PAGE
11 DEFENDANT'S EXHIBIT NO. 21 FOR ID     6
12 DEFENDANT'S EXHIBIT NO. 22 FOR ID     9
13 DEFENDANT'S EXHIBIT NO. 23 FOR ID     11
14 DEFENDANT'S EXHIBIT NO. 24 FOR ID     107
15 DEFENDANT'S EXHIBIT NO. 25 FOR ID     107
16
17
18     CERTIFIED QUESTION
19
       Page 91  Line 21
20
       Page 92  Line 7
21
       Page 92  Line 24
22
       Page 93  Line 19
23
24
25

**4**

1           PROCEEDINGS
2      Deposition taken before DEBORAH LAWRENCE, Court
3  Reporter and Notary Public in and for the State of Florida
4  at Large, in the above cause.
5      Thereupon,
6           (PAUL DEL VECCHIO)
7  having been duly sworn or affirmed, was examined and
8  testified as follows:
9           DIRECT EXAMINATION
10 BY MR. KISER:
11   Q.  Good morning, Mr. Del Vecchio.  My name is Mark
12 Kiser.  I'm from the law firm Trenam Kemker in Tampa,
13 Florida.  I am representing the defendant in this case, MLU
14 Services.
15      Could you please state your full name?
16   A.  My full name is Paul Joseph Del Vecchio.
17   Q.  What's your address, Mr. Del Vecchio?
18   A.  The business address is 2255 Glades Road, Suite
19 324-A, Boca Raton, Florida.
20   Q.  I assume you have had your deposition taken
21 before?
22   A.  Yes, sir.
23   Q.  I am going to try to make this as smooth as
24 possible.  If you don't understand any of my questions let
25 me know and I'll be happy to rephrase them to make sure we

**5**

1  have a clear record and you understand everything you're
2  answering.  If you need a break let me know.  If you need to
3  refer to documents to answer a question let me know.
4      Did you bring any documents with you today?
5   A.  Yes, this is an electronic copy of all the
6  documents that I reviewed including copies of the documents
7  I have in front of me.  I assumed I would be using in
8  reference to your questions.
9   Q.  Is this CV that you handed me that has got
10 Construction Consultants, this was a CV that was created by
11 you?
12   A.  Yes, sir.
13   Q.  That was created from hard copies?
14   A.  No, sir, electronic copies.
15   Q.  Then there is hard copies just certain documents
16 from this CV?
17   A.  Yes, sir.
18   Q.  We will look at this.  What are the other
19 documents contained on this CV that are not included in this
20 hard copy stack?
21   A.  All those items on this list that are earmarked
22 MLU.
23   Q.  The list you handed me, this is a listing that has
24 44 items.  Is this a listing of all the documents that you
25 were provided?

6

1  A. Yes.
2  MR. MEREDITH: May I see this? May I get a copy
3  of this before we leave?
4  THE WITNESS: Yes.
5  MR. KISER: Mark this as exhibit number one.
6  MR. MEREDITH: We agreed to make all the exhibits
7  sequential beginning from the first through the rest of
8  the depositions. If we can call this one for the
9  moment and then I will check with the office, see where
10  we should have started?
11  MR. KISER: We can do that on a break. It's
12  exhibit 21.
13  BY MR. KISER:
14  Q. You said that what's contained on that CV is
15  everything that is marked MLU?
16  A. Correct.
17  (Defendant's Exhibit No. 21 was marked for
18  identification.)
19  BY MR. KISER:
20  Q. It looks like the ones that have specific MLU
21  references are numbers eight, 12, 41 and 42?
22  A. Correct.
23  Q. Are those documents upon which you relied in
24  formulating your opinions?
25  MR. MEREDITH: Objection to form.

7

1  THE WITNESS: Correct.
2  BY MR. KISER:
3  Q. The ones that are marked MLU that we just
4  discussed?
5  A. Well, I viewed all the documents that you see on
6  this list. I am not sure that I would say I formulated my
7  opinion. I selected particular documents to meet the
8  assignment I was given. To be clearer about it I was given
9  an assignment to ascertain whether licensure was required
10  for the scope of work from the contract from FEMA. Some
11  documents I just breezed over and others I dug deeper. I
12  looked for documents candidly that are not on this list that
13  were not available. A composite influenced my decisions or
14  my opinions.
15  Q. Which documents did you say you looked for that
16  were not available?
17  A. Well, I was looking for amendments to the offer
18  from the government that may have altered the scope of work
19  that is embraced in the contract. If there were any change
20  orders or some other directions that may have changed the
21  scope of work that I was unaware of. If there were any
22  documents from any governing authorities that may have given
23  directions or insight into a course of conduct.
24  Q. In formulating your opinions with respect to MLU
25  set forth in your affidavit did you rely on any of the

8

1  documents contained in that list that are not referenced,
2  which MLU is not referenced?
3  MR. MEREDITH: Objection to form.
4  THE WITNESS: No. No, many of these documents
5  actually are redundant, if you will, in several forms.
6  So, no.
7  BY MR. KISER:
8  Q. Can I see the hard copy documents that you have in
9  front of you?
10  A. I have the affidavit and the contract and my
11  letter of agreement.
12  Q. When you say the contract are you referring to the
13  contract between FEMA and MLU?
14  A. Correct.
15  Q. It appears that the contractor obtained is Nu-Way?
16  A. I may have pulled the wrong cover sheet.
17  Q. So, that is not the MLU contract?
18  A. No, the cover sheet is for Nu-Way. The rest of it
19  is, as I said before, are contents among all the cases that
20  are standard in a temporary contract.
21  Q. Did you review the contract that is before you
22  with the Nu-Way cover sheet in rendering your opinions with
23  respect --
24  A. -- no, I just pulled it together, if you will,
25  this morning so I would have a hard copy in front of me with

9

1  respect to the actual boiler plate of the contract.
2  Q. Let me show you what we will mark as exhibit 22.
3  This is a copy of your depositions?
4  A. Yes, sir.
5  (Defendant's Exhibit No. 22 was marked for
6  identification.)
7  BY MR. KISER:
8  Q. There is a list of documents that are contained in
9  that notice. Have you seen this list before?
10  A. Yes, I am sure I have.
11  Q. Did you bring any documents that are responsive to
12  any of the categories listed in that notice?
13  A. I have all the documents on this CV along with
14  some e-mails on CD. There were no videotapes or motion
15  pictures or test studies or other imperial data.
16  Q. Treatises, journal articles, case law?
17  A. No, sir.
18  Q. Anything you reviewed in connection with
19  developing your opinion?
20  A. No, I did not bring copies of 320, 489 or 120 or
21  any of those that I am familiar with that I used to
22  formulate my opinion. No, they are not contained on that
23  disk.
24  Q. Are there any other -- aside from the statutes and
25  administrative codes are there any other treatises, journal

**10**

1  articles, periodicals, case law that you reviewed?
2      A.  No, sir, that is out of my purview.  Above my pay
3  rate.
4      Q.  Also, if you can, you need to let me finish before
5  you answer.  It's going to be easier on her.  I will make
6  sure I let you finish before asking the next question.
7      So, the documents, any documents that are
8  responsive to these categories would be contained on this
9  CV?
10     A.  Correct.
11     Q.  You said e-mails on CD.  What are the e-mails?
12     A.  There is an e-mail on there that I sent to Mr.
13  Meredith's office asking for additional documents.  There is
14  some e-mails that indicate they e-mailed me some documents
15  in response to my request.  That is pretty much it.  It's
16  all I recall.
17     Q.  All the documents you were provided by Mr.
18  Meredith's office came electronically through e-mail?
19     A.  Yes.
20     Q.  In preparation for your deposition today what did
21  you do in preparation?
22     A.  I reviewed the affidavit and I reviewed the
23  documents that are on that disk and I went back and
24  revisited some sections of 489 and 320 so I could have it
25  clear in my head.

**11**

1      Q.  Did you meet with Mr. Meredith?
2      A.  Yes, I did.
3      Q.  How long did you meet with Mr. Meredith?
4      A.  Couple hours.
5      Q.  You have a copy of your affidavit in front of you?
6      A.  Yes, I do.
7      Q.  Is that a copy that has got your CV attached as
8  well as your resume?
9      A.  No, it does not have my CV on it.
10     Q.  Copy here we will mark as exhibit 23 which is your
11  affidavit as provided to me and a hard copy of your CV and
12  your court case listings?
13     A.  Yes, sir.
14         (Defendant's Exhibit No. 23 was marked for
15  identification.)
16  BY MR. KISER:
17     Q.  Let's talk about your background a little bit.
18  What's your educational background?
19     A.  Graduate of the Lindenhurst High School of
20  Industrial Arts.
21     Q.  Where was that?
22     A.  In New York.
23     Q.  Any post high school education?
24     A.  None completed.
25     Q.  Did you attend any college?

**12**

1      A.  Yes, I take courses from time to time from FIU,
2  FAU, University of Miami.  I monitor courses on and off as I
3  deem the information helpful.
4      Q.  Over what period of time have you attended these
5  courses?
6      A.  Since 1970.  My last venture was three years ago
7  at FIU.
8      Q.  But you have not obtained any degree?
9      A.  No.
10     Q.  Is there a particular area in which the courses
11  you have taken were related?
12     A.  Administration, accounting, construction law,
13  engineering, surveying.  That is all that level.
14     Q.  If could you turn to your CV that is contained in
15  exhibit 23.  This first page of your CV, does this contain
16  your complete work history?
17     A.  Brief overview of it.  Go on for pages.  I have
18  been in the business for almost 40 years.
19     Q.  This describes early work as owner's
20  representative for a regional engineering firm.  Was that
21  one of your first positions?
22     A.  That was in 1970 or early '70s, yes.  That was
23  after I left the service.  That was one of my first jobs
24  here.
25     Q.  What was your military service?

**13**

1      A.  I was in the U.S. Navy for four and a half years.
2      Q.  What did you do in the Navy?
3      A.  I was rated as aviation structural mechanic
4  hydraulics.
5      Q.  What does that involve?
6      A.  Well, it qualified me to work on aircraft but that
7  is not what I did.
8      Q.  What did you do?
9      A.  I was a skip tracer.
10     Q.  What's that?
11     A.  I would find people who were on unauthorized
12  leave.
13     Q.  The engineering firm, where was that engineering
14  firm?
15     A.  Ft. Lauderdale.
16     Q.  What was the name of the firm?
17     A.  DE Britt Associates.
18     Q.  After there --
19     A.  -- I went to a regional and now national
20  construction firm as project manager.  I went to a company
21  then called Frank J. Rooney.  Later became Betty Balford.
22     Q.  When was it that you joined Frank Rooney?
23     A.  It would have been in the mid '70s.
24     Q.  How long were you with them?
25     A.  About four and a half, five years.

## 34

1  have failed to meet some minimum standard of the building
2  code. You knowingly violated the building code. Things of
3  that nature. If it's a first offense we usually issue a
4  letter of guidance. If you had your license for an extended
5  period of time that is the extent of it. Some city said you
6  didn't pull a permit for a fence or something like that we
7  will issue a letter of guidance. That is the normal
8  operating procedure.
9      Q.  When you say we are you referring to the licensing
10 board?
11     A.  The board is what issues the letters of guidance
12 cause they are the ones that regulate licensure.
13     Q.  You don't recall ever receiving a letter of
14 guidance?
15     A.  No, sir. If my records reflect that I will have
16 it removed because there was none issued.
17     Q.  Well, there is a listing on the DBPR web site
18 there was a letter of guidance issued in, I believe 1989. A
19 license activity investigation in 1988 and a letter of
20 guidance in '89.
21     A.  I helped a physician that was purportedly my
22 friend in getting him some subcontractors when he was
23 building his home. The first Iraqi conflict and the
24 subcontractor went off. He was a reserve officer, he went
25 off to Iraq. The physician decided that he didn't need to

## 35

1  pay the contractor even though the work was done but he
2  physically wasn't there. I told him that was highly
3  inappropriate. The contractor was a friend of mine. He was
4  in the service of his country. I am not going to stick him.
5  So, we had a disagreement then. Then the doctor claimed I
6  had signed a contract. The doctor is left-handed, I am
7  right-handed. When the investigator came and I signed my
8  name half a dozen times and he looked at it, looked at the
9  signature on the purported contract and said want to file
10 charges. That is the end of it. No letter of guidance was
11 ever issued to me.
12     Q.  Is that the incident --
13     A.  -- that would be the event, if any, cause that was
14 the only contact I had with DBPR before I joined the board.
15     Q.  Would that have been in the time frame of '88?
16     A.  It could be. When did we have the first Iraqi
17 conflict? That is my benchmark, if you will.
18     Q.  I thought it was '91 or '92. Let's look at your
19 affidavit which has been marked as exhibit 23. When this
20 was served on our office it was served as a rebuttal
21 affidavit.
22     Are you aware of who you might have been rebutting
23 in preparation of your affidavit?
24     A.  No, sir.
25     Q.  You consider your affidavit as a rebuttal

## 36

1  affidavit?
2      A.  No, sir.
3      Q.  Did you prepare your affidavit?
4      A.  Yes, sir.
5      Q.  Did you have help in preparing your affidavit?
6      A.  Yes, sir.
7      Q.  Who provided assistance to you?
8      A.  My wife who is my assistant. I communicated with
   Mr. Meredith. I communicated with him before I drafted it
10 actually. That was it.
11     Q.  You prepared the affidavit yourself, you and your
12 wife?
13     A.  My wife and I drafted it. I sent it to Mr.
14 Meredith. My recollection is he concurred with it. Then I
15 executed a sworn statement at the end.
16     MR. MEREDITH: I made revisions on that. I am
17 not sure whether I pointed out the specifics to him but
18 I did make revisions on that including the title. I
19 don't want to mislead the record.
20 BY MR. KISER:
21     Q.  That was my next question. Were there changes
22 made to the draft after you sent it to Mr. Meredith?
23     A.  I am sure there were.
24     Q.  Did you discuss any of those changes?
25     A.  I am sure we did. I don't know what they are.

## 37

1      Q.  Did you exchange drafts, did Mr. Meredith change
2  meaning he sent it back to you for review?
3      A.  I believe so. Part of that was a conversation of
4  my explanation of how construction activities are conducted.
5      Q.  What was that explanation?
6      A.  Well, within the State of Florida you cannot
7  construct or install, if you will, a manufactured home or
8  travel trailer or mobile home or however you would like to
9  title it in a semi-permanent position without meeting the
10 Florida Building Code which has requirements with respect to
11 loading, tie-down. That is also a part of the 320 licensure
12 that you have to know how to level it, that it doesn't blow
13 away during a storm event that we are subject to. In
14 Florida typically the prime contractor even if it is in the
15 a Division I contractor which is commonly referred to as
16 general contractor, if the preponderance of the work. By
17 example, I will use a mechanical contractor. Mechanical
18 work, when or she gets to another scope of work beyond their
19 licensure they subcontract to that other entity. That is
20 the normal course of building I eluded to earlier with
21 setting up office trailers you engage subcontractors.
22     Q.  Your earlier testimony was in setting up mobile
23 homes or office trailers?
24     A.  Same animal. The configuration for the interior
25 and ultimate use may be slightly different but it's an

| | 74 |
|---|---|

1  Q.  Related improvements to real estate?

2     MR. MEREDITH:  I'm still going to object to the

3  form.

4  BY MR. KISER:

5  Q.  In your opinion is a travel trailer a building or

6  structure or related improvements to real estate?

7  A.  It is a structure.

8  Q.  What's your basis for that opinion?

9  A.  It is a manufactured product that is in fact a

10  structure, a building, a mobile building.

11  Q.  It's your opinion it would be a structure

12  regardless of whether it's strapped down on a piece of

13  property or not?

14  A.  Correct.

15     MR. MEREDITH:  Object to form.

16  BY MR. KISER:

17  Q.  When you pull a travel trailer into a travel

18  trailer park or trailer park and hook it up to a water line

19  and electrical box would that involve contracting in your

20  opinion?

21     MR. MEREDITH:  Objection to form.

22     THE WITNESS:  Not as you describe it.

23  BY MR. KISER:

24  Q.  If you just connect it to a hose, to a water

25  spicket or hose spicket and then plug it into an electrical

| | 75 |
|---|---|

1  box that wouldn't involve contracting?

2  A.  Correct.

3  Q.  What if you tie it down or anchor it somehow?

4  A.  If you tie it down and you provide access, means

5  of egress, stairs, ramps, awnings, you hardwire it, besides

6  connecting it to an existing lateral you produce sewer

7  lines, sewer taps, water line and water taps then you're

8  engaging in construction activity.

9  Q.  When you say hardwire what do you mean by

10  hardwire?

11  A.  Means you take the cable, if you will, between the

12  panel in the mobile unit to a disconnect outside which is

13  normally on a pole or it's underground and that disconnect

14  is a direct connection.  It's not a plug.  It's hardwired.

15  That is the phrase.

16  Q.  So, it's not an actual plug like wall plug meaning

17  it's directly wired into the box?

18  A.  Correct.

19  Q.  I think you mentioned if you put something on like

20  an awning you referred to that would involve construction

21  activity?

22  A.  Correct.

23  Q.  Isn't there an exemption for awnings, for finished

24  products such as awning in 489?

25  A.  There is an exemption for their construction but

| | 76 |
|---|---|

1  not for their anchor to either a building or a slab.  That

2  comes under miscellaneous structural license or it could be

3  a Division I license.  It emanates from the requirement of

4  the building code.

5  Q.  It refers to the Division I and what other license

6  did you say?

7  A.  Division I or specialty structure license.  The

8  board issues specialty structure license for screen

9  enclosures, awning people, hurricane shutter people.  Those

10  types of folks.  Because all of those elements require a

11  permit under the building code.

12  Q.  What about the connection of a hose from a travel

13  trailer to existing water source?  Would that involve

14  construction activity?

15  A.  Not if there's a hose.  There's a detector check

16  on the supply side before it goes into the unit.  Then it's

17  just a temporary connection.  Not considered permanent water

18  source.  It's a hose.

19  Q.  It's not considered a permanent water source

20  because it's a hose?

21  A.  Correct.

22  Q.  So, the use of a hose as a water source connector

23  to an existing spicket would not be a construction activity?

24  A.  Correct.

25  Q.  489.105 sub three that we have been looking at

| | 77 |
|---|---|

1  does not define contracting -- sorry, does not include in

2  the definition of contractor the services of an electrical

3  contractor?

4  A.  That is a different part of 489.  489 is divided

5  into two parts.  One part deals with Division I and Division

6  I contractors and specialty license contractors.  The other

7  part deals with electrical including low voltage and high

8  voltage transmission lines and communications.  That is how

9  the legislature contemplated it.

10  Q.  But the contractors definition in 489 part one

11  does not include electrical contractor?

12  A.  No, it's elsewhere in 489.

13  Q.  So, do you evaluate whether MLU was contracting as

14  it's defined in part two of 489 relating to electrical

15  contractors?

16  A.  Yes.

17  Q.  There's no reference to part two in your affidavit

18  with respect to electrical contractor; is that correct?

19  A.  No, I did not define it that way.

20  Q.  On page one of your affidavit you identified two

21  questions that you were asked to render an affidavit on?

22  A.  Yes, sir.  To answer both of those questions I

23  looked at the Florida Contracting Statute Chapter 489 and

24  applied the provision of that statute to the facts of this

25  case.  Yes, sir.

20  (Pages 74 to 77)

78

1    Q.  And interpreted what the requirements of 489 would
2  be with respect to what MLU, the scope of work MLU
3  contracted for?
4    A.  Correct.
5    Q.  When you say -- the first question can someone who
6  is unlicensed who is not acting as owner builder enter a
7  contract which requires the performance of construction
8  activities, that can word, does that just mean it's
9  permissible under 489?
10      MR. MEREDITH:  Objection to form.
11      THE WITNESS:  That would be the intent.
12  BY MR. KISER:
13    Q.  Or you're analyzing whether someone can enter into
14  such a contract?
15    A.  Correct.
16    Q.  The same for the second question.  That can
17  someone subcontract with licensed contractors.  That means
18  it's permissible under Chapter 489?
19    A.  Without being the owner builder?
20    Q.  Correct.
21    A.  The answer is as I wrote here, yes.
22    Q.  In rendering your opinion are you providing any
23  interpretation or explanation of technical terms of that
24  specialized meaning within the construction industry?
25    A.  No, I provided a basic understanding of the

79

1  industry and its knowledge.
2    Q.  Both of these questions as identified in paragraph
3  one of your affidavit rely on the assumption there were
4  construction activities for which MLU contracted?
5    A.  Correct.
6    Q.  On page one of your affidavit you refer to certain
7  exemptions to contract without a license under Chapter 489?
8    A.  Yes, sir.
9    Q.  Those exemptions, that reference to the exemptions
10  are the exemptions contained in 489.103; is that right?
11    A.  Yes.
12    Q.  Under 489.103 there is no exemption for the
13  installation work associated with a mobile home; is that
14  right?
15    A.  Repeat that.
16    Q.  Is there an exemption under 489.103 for the
17  installation work associated with a mobile home?
18    A.  If I remember correctly it refers to another
19  section within the Chapter.
20    Q.  My question was related to the exemption --
21  rephrase.  Part of your opinion is MLU would have needed a
22  Division I contractor's license to contract for the work
23  they were going to do unless they fell within certain
24  exemptions?
25    A.  Correct.

80

1    Q.  Those exemptions are contained within 489.103?
2    A.  Yes.
3    Q.  My question is under 489.103 is there exemptions
4  for installation work associated with a mobile home?
5    A.  I see none.
6    Q.  Under exemptions associated with the work or
7  exemptions for the work associated with the installation of
8  a travel trailer?
9    A.  No.
10    Q.  Let's look at your affidavit on page two,
11  paragraph four.  You're providing an opinion as to what
12  license MLU needed to legally enter the contract?
13    A.  Correct.
14    Q.  Later on at the bottom of that page you state MLU
15  can only tender for acceptance those items that conform to
16  the contract.
17      What is that opinion based on?
18    A.  Just as it is stated here.
19    Q.  What do you mean just as it is stated here?
20    A.  It goes on to say a licensed contractor can
21  install travel trailers.  MLU would have had to have a
22  Division I license since the contract required that MLU
23  engage in construction activities governed by Chapter 489.
24  Then it goes on to explain the activities that are embraced
25  in the contract that are construction activities.

81

1    Q.  We looked at those construction activities in the
2  contract.  The sentence MLU can only tender for acceptance
3  those items that conform to the contract, do you know if you
4  drafted that?
5    A.  I don't recall.
6    Q.  What's your understanding what that sentence
7  means?
8    A.  As it's stated it could only tender for acceptance
9  those items that conform to the contract and it lists MLU's
10  contract.  I don't know how to explain what it says other
11  than what it says.
12    Q.  We looked at 1253, the items we talked about that
13  were construction activities, TT02-09, 14, 15, 16, 19.
14      Is it your understanding these are activities
15  which fall outside the basic travel trailer set up?
16    A.  Yes, sir.  Sewer line allowed is four inches.
17  When you start getting into the six and eight inch size pipe
18  you're into the distribution system.  Same thing when you go
19  to a sewer tap that is going into the public right of way
20  and tying into the public sanitation system.  Water line,
21  three quarters inch is supplied.  Water line two inches is
22  main.  That is supply.  Then you add municipal water tap
23  that is again, you're back into the public utilities.  All
24  of which when you get into potable water requires a plumber
25  to perform that work.  It is clearly a 489 construction

86

1  A. Both. It's a time constraint. Reasonable short
2  period of time and reasonable, that can be determined by the
3  building official. Five days, 10 days, 45 days. I don't
4  know what that number is. Traditionally it's 30. It's up
5  to each jurisdiction as to what they want to determine.
6  Then the other is whether the unit is tied down, have the
7  wheels been removed from it, does it have a permanent ramp
8  or stair set to it. Is there a slab poured outside of it
9  and awning placed on it. You know, is it more of a
10  permanent nature or a weekend jaunt. We are mixing the two
11  and that is not what this scope of work says.
12  Q. There's no time frame attached to this scope of
13  work though?
14  A. No, sir.
15  Q. As far as how long a travel trailer was designed
16  to be in place?
17  A. Correct. Based on the services that are required
18  that appears to be longer than what would be reasonably
19  contemplated as a short period of time. This doesn't appear
20  as a scope of work that would be consistent with a 30 day or
21  less.
22  Q. The tying it down is itself -- would that be
23  construction activity in your opinion?
24  A. It would be a construction activity under 320,
25  yes.

87

1  Q. I am talking under 489?
2  A. It would only be a construction activity or an
3  obligation under 489 in as much the 489 contractor has to
4  comply with code. A code requires it to be tied down. Who
5  performs the work is another issue.
6  Q. What code requires --
7  A. -- Florida Building Code.
8  Q. Talking with respect to travel trailers?
9  A. Again, any structure that is installed in a
10  semi-permanent basis falls under the Florida Building Code.
11  Q. But under 489 would the anchoring and strapping
12  down of a travel trailer constitute work for which a general
13  contractor's license Division I was required?
14  A. I don't see it that way. That would be the
15  building administrator who would determine that it is a code
16  requirement.
17  Q. When you say you don't see it that way does that
18  mean --
19  A. -- there's no specific language that says that is
20  the scope of work of a Division I contractor.
21  Q. Anchoring or tying down would not fall under the
22  definition of the scope of work of a Division I contractor?
23  A. No. Okay. Let me step back. Maybe I am not
24  being clear. Under 489 as a contractor we are required to
25  comply with all applicable building codes. Part of the

88

1  building code is to secure temporary structure. Temporary
2  being the operable phrase. So, it becomes semi-permanent.
3  That is when we go through the tie-down process. It's a
4  construction activity if a 489 contractor is the prime
5  contractor on a contract. He would subcontract as he would
6  do the electrical or plumbing or mechanical or anything
7  else. The appropriate duties to other specialized licensed
8  trades. Am I clear or am I not clear?
9  Q. But I guess my question is do the anchoring and
10  tie-down, is it your opinion that is an activity that would
11  require one to have a Division I contractor's license to
12  perform.
13  A. That solely by itself isolated?
14  Q. Correct.
15  A. No.
16  MR. MEREDITH: Bathroom?
17  MR. KISER: Sure.
18  (Brief recess is taken.)
19  BY MR. KISER:
20  Q. Let's look at your affidavit on page five, very
21  top right before paragraph 10. You state MLU also engaged
22  in unlicensed contracting with constructing handicap ramps
23  and other structures.
24  What other structures are you referring to?
25  A. Steps. Were there steps installed? At least

89

1  based on the information I gleaned there were.
2  Q. Anything else? Steps is what you're referring to
3  there?
4  A. Correct.
5  Q. So, the fabrication of steps would be a
6  construction activity?
7  A. The fabrication, anchoring of steps and or ramps
8  are part of the building code besides what we discussed
9  before as far as turning radius and width and rise and run
10  and the slope. Also anchoring it so it doesn't become a
11  flying projectile during a storm event.
12  Q. I understand you say that is part of the building
13  code. Is that an activity for which one would need a
14  Division I contractor's license to perform?
15  A. Yes.
16  Q. So, that would be a construction activity?
17  A. Yes.
18  Q. As we have been discussing. In paragraph ten you
19  say MLU was required to only bid a portion of a contract
20  that did not require a license and obtained from the
21  government a de-obligation report to delete those items to
22  which it was ineligible to contract.
23  Where in the contract -- what's your basis for
24  that opinion?
25  A. My experience with working under the FAR, Federal

23 (Pages 86 to 89)

**EXHIBIT "C"**

VIDEOTAPED DE BENE ESSE DEPOSITION OF BRYAN MCCREARY
CONDUCTED ON FRIDAY, DECEMBER 11, 2009

1 (Pages 1 to 4)

---

**Page 1**

```
1            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2                 ORLANDO DIVISION

3   UNITED STATES OF AMERICA,   :
    ex rel, GREGORY CHABOT,     :
4   as qui tam Plaintiff,       :

5       Plaintiff,              :

6   v.            :  Case No.:
                  :  6:06-CV-1529-ORL-35KRS
7   NU-WAY CONCRETE CO., INC.,  :

8       Defendant.             :

9   UNITED STATES OF AMERICA,   :
    ex rel, GREGORY CHABOT,     :
10  as qui tam Plaintiff,       :

11      Plaintiff,             :

12  v.            :  Case No.:
                  :  6:06-CV-1532-ORL-35KRS
13  ROBERTO PEREDES,           :
    Individually, and STEVE    :
14  JONES, Individually, d/b/a  :
    STEVE JONES HOMES, INC.,    :
15
        Defendant.             :
16
17  UNITED STATES OF AMERICA,   :
    ex rel, GREGORY CHABOT,     :
18  as qui tam Plaintiff,       :

19      Plaintiff,             :

20  v.            :  6:06-CV-1531-ORL-35KRS
    RV SERVICES, LLC,          :
21
        Defendant.             :
22  _____
```

---

**Page 2**

```
1   UNITED STATES OF AMERICA,   :
    ex rel, GREGORY CHABOT,     :
2   as qui tam Plaintiff,       :

3       Plaintiff,             :

4   v.            :  Case No.:
                  :  6:06-CV-1534-ORL-35KRS
5   WESTGATE HOMES, INC.,      :

6       Defendant.             :

7   UNITED STATES OF AMERICA,   :
    ex rel, GREGORY CHABOT,     :
8   as qui tam Plaintiff,       :

9       Plaintiff,             :

10  v.            :  Case No.:
                  :  6:06-CV-1535-ORL-35KRS
11  WILSON TRANSPORT MOBILE     :
    HOMES SERVICES, INC., and   :
12  MULTI-TASK, LLC,            :

13      Defendant.             :

14  UNITED STATES OF AMERICA,   :
    ex rel, GREGORY CHABOT,     :
15  as qui tam Plaintiff,       :

16      Plaintiff,             :

17  v.            :  Case No.:
                  :  6:06-CV-1528-ORL-35KRS
18  MLU SERVICES, INC.,        :

19      Defendant.             :

20      Videotaped De Bene Esse Deposition of
               BRYAN MCCREARY
21          Emmittsburg, Maryland
           Friday, December 11, 2009
22               10:53 a.m.
```

---

**Page 3**

```
1   Job No.:  24-170255

2   Pages 1 through 91

3   Reported by:  Peggy L. Dingle

4

5

6        Videotaped De Bene Esse Deposition of BRYAN

7   MCCREARY, held at the offices of:

8

9        FEDERAL EMERGENCY MANAGEMENT AGENCY

10       16825 South Seton Avenue

11       Building M, Room 202

12       Emmitsburg, Maryland  21727

13       (800)638-1821

14

15

16

17       Pursuant to agreement, before Peggy L.

18  Dingle, Notary Public of the State of Maryland

19

20

21

22
```

---

**Page 4**

```
1              A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFF UNITED STATES OF AMERICA:

3       JENNIFER CHORPENING, ESQUIRE

4       U.S. Department of Justice, Civil Division

5       P.O. Box 261

6       Ben Franklin Station

7       Washington, D.C.  20444

8

9

10

11  ON BEHALF OF PLAINTIFF GREGORY CHABOT:

12      PAUL M. MEREDITH, ESQUIRE

13      Meredith Law Firm

14      Five Palm Row

15      Suite A St. Augustine

16      St. Augustine, Florida  32084

17      (904)825-1942

18

19

20

21

22
```

---

VIDEOTAPED DE BENE ESSE DEPOSITION OF BRYAN MCCREARY
CONDUCTED ON FRIDAY, DECEMBER 11, 2009

11 (Pages 41 to 44)

41

1  contract?
2    A    Correct.
3    Q    So if a contractor had submitted prices
4  for both mobile homes and travel trailers and then
5  only wanted to do travel trailers, they would have to
6  go through this partial termination procedure?
7    A    Yes.
8    Q    But if they submit a price for just travel
9  trailers, that is sufficient and acceptable to FEMA
10 to enter into a contract just for travel trailer
11 installations?
12   A    Yes.
13   Q    Okay.  And do you recall if there were
14 contractors that entered into contracts just for
15 travel trailers?
16   A    My recollection is, yes, there were
17 several, I believe.
18   Q    And that was -- that was acceptable to
19 FEMA that they had some contractors that only did
20 travel trailers?
21   A    Yes, we did consider awards for just
22 mobile homes or travel trailers.

42

1    Q    And if FEMA had a contract with a
2  contractor just for travel trailers, they wouldn't
3  give them mobile homes to install?
4    A    Correct.
5    Q    Do you recall if MLU was one of the
6  contractors that entered into a contract with FEMA
7  just for travel trailers?
8    A    I don't.  I would have to see the
9  contract.
10   Q    All right.  Do you recall MLU Services at
11 all?
12   A    Just the name.  I don't -- that's about
13 it.
14   Q    Do you recall any communications with
15 anyone from MLU Services?
16   A    No.
17   Q    Mr. McCreary, I believe you just testified
18 this morning that there was a -- you got -- FEMA
19 performed a limited FEMA or -- or FAR Part 9 review
20 due to the circumstances.
21   A    Yes.
22   Q    And my question is what circumstances are

43

1  you referring to?
2    A    Due to the emergency -- emergency and the
3  speed at which time frame we had to work in.
4    Q    So speed was a -- a critical factor in
5  this temporary housing operation?
6    A    Yes.
7    Q    Was it a -- sort of a chaotic time during
8  the -- the initial start-up process of this disaster
9  relief?
10   A    Yes.
11       MR. MEREDITH:  Objection to form.
12 BY MR. KISER:
13   Q    The scope of the displaced residents
14 was -- was large?
15   A    Yes.
16   Q    Was it one of the larger temporary housing
17 operations in which you have been involved?
18   A    It was the largest at that point.
19   Q    The largest at that point?  And FEMA was
20 trying to get units installed as quickly as possible?
21   A    Yes, there is a tremendous pressure to do
22 that.

44

1    Q    And that was the reasons -- part of the
2  reasons why there was just a limited Part 9 review?
3    A    Yes.
4    Q    MLU entered into a contract with FEMA
5  and -- and as a result of entering into a contract
6  with FEMA there was a determination by FEMA that MLU
7  was qualified and eligible; is that correct?
8        MR. MEREDITH:  Objection to form.
9        THE WITNESS:  Yes.
10 BY MR. KISER:
11   Q    And the prices that MLU charged for the
12 work they performed were determined to be --
13 determined to be fair and reasonable?
14       MR. MEREDITH:  Objection to form.
15       THE WITNESS:  Correct.
16 BY MR. KISER:
17   Q    I believe you testified in your previous
18 deposition about a -- a -- I think you called it like
19 a default situation where a contractor was required
20 to provide a bid on all line items and not just
21 partial ones.  Do you recall is that -- was that
22 testimony referring to a contractor providing a bid